UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:18-cr-891 HEA ) ) |
| WYLAND KINNEY, | ) ) |
| Defendant. | ) ) |

**GOVERNMENT'S TRIAL BRIEF**

COMES NOW, the United States of America, by and through its attorneys, Sayler A. Fleming, United States Attorney for the Eastern District of Missouri, Kyle T. Bateman and Tiffany G. Becker, Assistant United States Attorneys for said District, and submits the following trial brief.

## I.  FACTS

Defendant Kinney is charged in a four-count second superseding indictment with, Count I, distribution of a controlled substance that resulted in the death of another (victim J.P.), in violation of Title 21, United States Code, Section 841(b)(1)(C); Counts II and III, distribution of fentanyl, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C); and Count IV, felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g).

On the evening of August 16, 2018, Florissant Police Department officers arrived at 1060 Spring Valley Drive in response to a call regarding a possible drug overdose.  Upon arrival, officers met with Ms. Ann McFadden, who reported that she found her grandson, J.P. (a/k/a "Sulu"), unconscious in a basement bathroom at approximately 7:55 pm.  Officers observed J.P. lying on his back with a brown liquid or foam substance oozing from his nose and mouth.  Around J.P.'s

arm was a blue band.  Inside the bathroom, there was an uncapped syringe and spoon.  Paramedics arrived shortly after but were unsuccessful in reviving J.P.  J.P. was pronounced dead at 8:14 pm.

Ms. McFadden told officers that J.P. had been battling heroin addiction for some time and that he had recently been in rehabilitation treatment.  Ms. McFadden told officers that, earlier that day, J.P. had been with his long-time friend, Mr. Liam Cleaveland-Acklin, who was also a heroin user.  After Mr. Cleaveland-Acklin left that afternoon, J.P. went into the basement.  Ms. McFadden last heard J.P. around 7:30 pm when she called downstairs and he responded that he was in the bathroom.  She called down again around 7:50 pm, and he did not respond.  Ms. McFadden went into the basement and saw J.P. sitting backwards on the toilet, slumped over and unconscious.  This is when she called 911 for assistance.

Ms. McFadden, who was the administrator and account holder for J.P.'s cell phone plan, provided officers with J.P.'s silver Samsung SMG530T cell phone as well as consent to search the phone and cell phone records.  Officers reviewed J.P.'s phone records and noted that there were 11 text messages between J.P. and a phone number ending in #8454 between 10:44 am and 12:18 pm on the day he died, August 16, 2018 (including 10 outgoing text messages from J.P.).  In addition, there were 16 phone calls between J.P. and the phone number ending in #8454 between August 14, 2018, and August 16, 2018 (including an incoming call at 2:31 pm on 8/16/2018).

Mr. Kenneth Nix, from the Regional Crimes Education and Enforcement Group (RCEEG), forensically examined J.P.'s phone.  Mr. Nix observed that J.P. had saved the #8454 phone number as "Brett" in his phone.  Mr. Nix also observed the following pertinent calls and text messages between J.P., "Liam," and "Brett."

| Date and Time | Event |
|---|---|
| 8/15/18 6:40 pm | J.P. texted "Liam": "**I got you tomorrow I talked to the boss and he said he's going to come through tomorrow**" |
| 8/15/18 6:51 pm | "Liam" texted J.P.: "**I may not have the car tomorrow**" |
| 8/15/18 6:53 pm | J.P. texted "Liam": "**That's all good and I'll walk to you or you can come over here and boss man I'll come through**" |
| 8/15/18 9:56 pm | J.P. texts "Brett": "**I'm trying to get you all the way over here in the morning**" |
| 8/15/18 9:56 pm | "Brett" texts J.P.: "**Ok**" |
| 8/15/18 9:56 pm | J.P. texts "Brett": "**About 10 10-30 when I'll be ready**" |
| 8/15/18 9:56 pm | "Brett" texts J.P.: "**Ok**" |
| 8/16/18 10:10 am | J.P. texted "Brett": "**S*** the paperman hasn't come through like it's supposed to I'll let you know what the word is**" |
| 8/16/18 10:46 am | J.P. texted "Brett": "**Hmb I have Kathy's paper work at about 12:30**" |
| 8/16/18 10:47 am | "Brett" texted J.P.: "**Ok**" |
| 8/16/18 11:53 am | J.P. texted "Brett": "**Come on and slide through looking to hook up with cathey I got to leave out of here by 2 I got doctors appointments and it's going to take like all f****** day**" |
| 8/16/18 12:07 pm | J.P. texted "Brett": "**Can Cassie get over here kind soon cuz I'm trying to relax for a minute before I got to go do like 4 hours and Doctor b*******\***" |
| 8/16/18 1:20 pm | J.P. texted "Brett": "**Yo**" |
| 8/16/18 1:42 pm | J.P. called "Brett" |
| 8/16/18 1:44 pm | J.P. texted "Brett": "**U close**" |
| 8/16/18 1:48 pm | J.P. called "Brett" |
| 8/16/18 1:52 pm | J.P. called "Brett" |
| 8/16/18 1:53 pm | J.P. texted "Brett": "**You going to be here before I got to leave**" |
| 8/16/18 2:01 pm | J.P. called "Brett" |
| 8/16/18 2:01 pm | J.P. texted "Brett": "**I got to leave at 2:45**" |
| 8/16/18 2:09 pm | J.P. texted "Brett": "**Nvrmind my boy who want to see her let**" |
| 8/16/18 2:18 pm | J.P. texted "Brett": "**Nevermind his punk ass is walking back**" |
| 8/16/18 2:19 pm | J.P. called "Brett" |
| 8/16/18 2:19 pm | "Brett" called J.P. |
| 8/16/18 2:31 pm | "Brett" called J.P. |

"Liam" is Mr. Cleaveland-Acklin, J.P.'s long-time friend. Mr. Cleaveland-Acklin had previously used heroin with J.P., but had not done so since approximately April 2018. Mr. Cleaveland-Acklin used to buy heroin from "B", and when interviewed by police still had "B's" phone number ending in #8454 memorized. He knew "B" to drive a tan Mountaineer. Mr.

3

Cleaveland-Acklin told officers that J.P. had "B" in his (J.P.'s) phone as "Brett." Mr. Cleaveland-Acklin knew that J.P. had obtained heroin from "B" regularly in the past. Mr. Cleaveland-Acklin identified the defendant as the individual he knew as "B." On the afternoon of August 16, 2018, Mr. Cleaveland-Acklin visited J.P. at J.P.'s grandmother's residence in Florissant. The two sat on the back porch together. J.P. and Mr. Cleaveland-Acklin planned to together purchase heroin from "B" that afternoon. At one point, "B" called J.P. and J.P went behind a back fence to complete the sale of the heroin from "B." J.P. returned to the back porch with heroin.

Based on the communications between J.P. and "Brett" (defendant Kinney), officers obtained a St. Louis County search warrant for the defendant's phone number registered through Sprint Spectrum. The records show that, on August 16, 2018, between 10:10 am and 2:18 pm, J.P. contacted the defendant 22 times. Similarly, on the same date, between 10:47 am and 2:31 pm, the defendant contacted J.P. 3 times. These records also show that the defendant's phone was at or near J.P.'s residence that day.

In September and October, 2018, officers conducted surveillance at the defendant's residence (2550 Haber Drive) and observed a 2003 tan Mercurcy Mountaineer and a 2000 black Ford F-150 parked in the driveway. These vehicles were registered to Ms. Melva Davis. Officers observed the defendant entering and exiting the residence and driving the tan Mercury Mountaineer and the black Ford F-150. During the surveillances, the defendant was observed driving to various residences and completing what appeared to be and were consistent with hand-to-hand drug transactions with other individuals.

Thereafter, law enforcement utilized a reliable confidential information (C.I.) to conduct two controlled purchases of heroin from the defendant. The C.I. had previously purchased heroin regularly from the defendant, whom he/she called "BB."

4

On October 11, 2018, with law enforcement monitoring, the C.I. texted the defendant at his phone number (ending in #8454) and requested to purchase $30 worth of heroin. The defendant responded back that he would deliver the heroin to the C.I. Officers observed the defendant leave his residence at 2550 Haber Drive in the 2003 tan Mercury Mountaineer. The defendant arrived at the agreed upon location and handed the C.I. a zipperlock clear plastic bag containing two rock-like substances in exchange for $30. Thereafter, the defendant was observed travelling to other locations and engaging in what appeared to be and were consistent with hand-to-hand drug transactions. The substance purchased by C.I. was analyzed by the St. Louis County Crime Lab and was determined to be 0.375 grams of a mixture of fentanyl, a Schedule II controlled substance, and ketamine, a Schedule III controlled substance.

On October 12, 2018, again with law enforcement monitoring, the C.I. again texted the defendant at his phone number (ending in #8454) and requested to purchase $30 worth of heroin. The defendant responded back that he would deliver the heroin to the C.I. Officers again observed the defendant leave his residence at 2550 Haber Drive in the 2003 tan Mercury Mountaineer. The defendant arrived at the agreed upon location and handed the C.I. a zipperlock clear plastic bag containing two gray rock-like substances in exchange for $30. The substance was analyzed by the St. Louis County Crime Lab and was determined to be a 0.309 gram mixture of fentanyl, a Schedule II controlled substance, and ketamine, a Schedule III controlled substance.

On October 16, 2018, law enforcement obtained a St. Louis County search warrant for defendant's residence at 2550 Haber Drive. Officers executed the warrant on October 18, 2018, beginning at approximately 6 am. Inside the residence, officers discovered Ms. Melva Davis in a master bedroom, Mr. Jordan Davis (the son of Ms. Melva Davis) in an adjacent spare bedroom, and the defendant in the basement.

In the basement, officers discovered two firearms on a computer desk, specifically: a Smith & Wesson 22A-1 handgun UCM5152 and an Interarms M68 revolver D484209 (loaded with 5 rounds).  In addition, on a coffee table, next to the defendant's identification card, officers discovered a Mossberg 500 12 gauge shotgun U104721 (loaded with 6 rounds).  Also found on this table were three clear plastic baggies containing a leafy green substance, a metallic grinder, two Samsung cell phones, and $6,443 in U.S. currency.  Nearby, officers found two boxes of sandwich baggies and a green box containing numerous boxes of 7.62 caliber ammo and 12 gauge shotgun shells.  Also in the basement, officers discovered a hidden door leading to a room that contained electric fans, heaters, grow lamps, and air ducts.

On the main floor, officers discovered a green metal gun safe in the front hallway closet. Inside the gun safe, officers found assorted ammo and magazines, and the following:

1. Smith & Wesson BG38 caliber revolver CSW6298
2. Mangum Research Micro Desert Eagle 380 handgun ME07630
3. Ruger SR45 handgun 38007093
4. Smith & Wesson MP40 handgun MRE3811
5. Mossberg 500 12 gauge shotgun U677385
6. Benelli Mova 12 gauge shotgun Z711819Z
7. Winchester Super X 12 gauge shotgun 12AZX13440
8. Mossberg 500 12 gauge shotgun U615612
9. Draco AK 5.56 M85PV004482
10. Romarm WSAR1- 7.62 caliber rifle A1-18070-13RO
11. Mossberg 715t 22 caliber rifle ELH3460539

All of these firearms were examined and were found to have traveled in interstate commerce.  With the exception of the Smith & Wesson 22A-1 handgun UCM5152, all of the firearms functioned as designed and meet the federal definition of a firearm.  Law enforcement performed a swab on the three firearms that were discovered in the basement.  Separately, law enforcement performed a buccal swab on the defendant.  The results from these swabs were

6

analyzed by a forensic scientist with St. Louis County Crime Lab, who determined that the DNA discovered on each of the three firearms was a match to the defendant.

Law enforcement forensically examined one of the defendant's phones that was seized from the basement of his residence. This phone had J.P., Mr. Cleaveland-Acklin, and the C.I. saved as contacts. The earliest dated call that was discovered on this phone was dated October 17, 2018, which was one day before the phone was seized. There were approximately 200 text messages discovered on this phone dating between October 5 and 17, 2018. Many of these messages appear to be communications with others regarding the purchase of controlled substances.

Law enforcement interviewed the defendant at the Florissant Police Department on the same day that the residence was searched. At the beginning of the interview, the defendant was read his Miranda rights and he indicated that he understood his rights. During the interview, the defendant stated that he sleeps in the basement of the searched residence. The defendant also admitted that he had prior felony convictions, including one where he received a 10-year sentence. The defendant also admitted that he knew that he cannot possess a firearm because of his status as a felon. Finally, the defendant admitted that he had done research on the issue as to whether a gun can be kept in the same residence as a convicted felon.

## II.  LEGAL ANALYSIS

### A.  ELEMENTS OF THE OFFENSE

#### 1.   21 U.S.C. § 841(a)(1) – DISTRIBUTION OF A CONTROLLED SUBSTANCE RESULTING IN THE DEATH OF ANOTHER

The crime of distribution of a controlled substance resulting in death as charged in Count I is proscribed by 21 U.S.C. § 841(a)(1). Conviction requires proof that 1) the defendant intentionally transferred a controlled substance; 2) at the time of the transfer, the defendant knew

7

that it was a controlled substance; and 3) Victim J.P. would not have died but for the use of that controlled substance transferred by the defendant.

The Government need not prove that the defendant intended to cause the death of victim J.P., nor does the Government need to prove that defendant knew or should have known that he was exposing victim J.P. to a risk of death when defendant transferred the controlled substance. *United States v. Washington*, 596 F.3d 926, 946 (8th Cir. 2010).

The Government must prove that victim J.P.'s death resulted from the unlawfully transferred controlled substance, not merely from a combination of factors to which drug use merely contributed. *Burrage v. United States*, 134 S. Ct. 881, 891 (2014); *United States v. Ford*, 750 F.3d 952, 955 (8th Cir. 2014) (finding that the Government must prove that the distributed controlled substance was a but-for cause of death, and not just a contributing factor to death).

### 2. 21 U.S.C. § 841(a)(1) – DISTRIBUTION OF CONTROLLED SUBSTANCE

The crime of distribution of a controlled substance as charged in Counts II and III is proscribed by Title 21, United States Code, Section 841(a)(1). Conviction requires proof that 1) the defendant intentionally transferred a controlled substance; and 2) at the time of the transfer, the defendant knew that it was a controlled substance.

The defendant need not know what the controlled substance is if he knows he has possession of some controlled substance. *United States v. Sheppard*, 219 F.3d 766, 770 (8th Cir. 2000).

### 3. 18 U.S.C. § 922(g) – FELON IN POSSESSION OF A FIREARM

The crime of felon in possession of a firearm as charged in Count IV is proscribed by Title 18, United States Code, Section 922(g). Conviction requires proof that 1) the defendant had been convicted of a crime punishable by imprisonment for more than one year; 2) the defendant

8

knowingly possessed a firearm; 3) at the time defendant knowingly possessed the firearm, he knew he had been convicted of a crime punishable by imprisonment for more than one year; and 4) the firearm was transported across a state line at some time during or before the defendant's possession of it.

The Government must prove that the defendant knew that he belonged to the relevant category of persons barred from possessing a firearm. *See United States v. Davies*, 942 F.3d 871, 873 (8th Cir. 2019); *Rehaif v. United States*, 139 S. Ct. 2191, 2200 (2019) ("the defendant's status is the 'crucial element' separating innocent from wrongful conduct"). The Government may prove the defendant's knowledge circumstantially, including by presenting evidence that the defendant spent time in prison. *See United States v. Hollingshed*, 940 F.3d 410, 415–16 (8th Cir. 2019) (stating that defendant serving four years in prison followed by an additional fifteen months on a revocation are indications that the defendant knew he had been convicted of a crime punishable by imprisonment for a term exceeding one year).

Possession of a firearm can be actual or constructive and be sole or joint. *United States v. Battle*, 774 F.3d 504, 511 (8th Cir. 2014). Actual possession is direct and physical control over the weapon. *United States v. Stoltz*, 683 F.3d 934, 940 (8th Cir. 2012). "Constructive possession of the firearm is established if the person has dominion over the premises where the firearm is located, or control, ownership, or dominion over the firearm itself." *United States v. Boykin*, 986 F.2d 270, 274 (8th Cir. 1993). The Government may establish constructive possession through circumstantial evidence alone, but must show a sufficient nexus between the defendant and the firearm. *United States v. Chatmon,* 742 F.3d 350, 351 (8th Cir. 2014); *see also United States v. Roberts*, 787 F.3d 1204, 1212 (8th Cir. 2015) (stating that the presence of defendant's DNA profile on the firearm, combined with other factors, is sufficient to show constructive possession). While

9

mere physical proximity to a weapon alone does not establish constructive possession, knowledge of its presence combined with its control, does. *United States v. Mann*, 701 F.3d 274, 304-05 (8th Cir. 2012).

If the firearm traveled in interstate commerce at some time, even prior to its possession, then the jurisdictional nexus is met. *Scarborough v. United States*, 431 U.S. 563 (1977); *United States v. Schmidt*, 571 F.3d 743, 747 (8th Cir. 2009). Evidence that the weapon was not manufactured in the state of Missouri, proves it traveled in interstate commerce at some point. *United States v. Banks*, 514 F.3d 769, 777 (8th Cir. 2008). The manufacturer's markings on the firearm itself can establish in which state the weapon was made. *United States v. Bowling*, 32 F.3d 326, 328 (8th Cir. 1994).

The term "firearm" means any weapon which will or is designed to or may be readily converted to expel a projectile by the action of an explosive. 18 U.S.C. § 921(a)(3). Thus, the Government need only prove that a firearm was 'designed' to fire, not that it is actually capable of doing so. *United States v. Cloyd*, 819 F.2d 836, 838 (8th Cir. 1987).

### III.  EVIDENTIARY ISSUES

#### A.  EXPERT TESTIMONY

Under Federal Rules of Evidence, Rule 702, a qualified witness may testify as an expert, "(I)f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." The rule is one of inclusion, not exclusion. *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1298 (8th Cir. 1997). Expert testimony must be based on sufficient facts, be the product of reliable principles and methods, and the reliable application of those principles and methods to the facts. Fed. R. Evid. 702.

District courts are given "wide latitude" in determining whether expert testimony has the requisite reliability to be admitted. *First Union Nat. Bank v. Benham*, 423 F.3d 855, 861 (8th Cir. 2005). This decision will not be disturbed unless clearly abused. *Margolies v. McCleary, Inc.*, 447 F.3d 1115, 1120 (8th Cir. 2006); *United States v. Hughes*, 15 F.3d 798, 800 (8th Cir. 1994).

In this case, the Government will be qualifying several different types of expert witnesses for issues related to: (1) the medical examination and toxicology results of victim J.P.; (2) the DNA comparisons from the seized firearms and the defendant; (3) the seized controlled substances; (4) the seized firearms; and (5) the method of operation of drug distributors. As mentioned in the Government's expert notices, each of these individuals has the requisite training and experience, and adequate facts and data, to perform their respective examinations.

A district court may permit law enforcement officers to give expert testimony concerning the *modus operandi* of drug dealers, because most jurors are not familiar with the trade. *United States v. Schwarck*, 719 F.3d 921, 923 (8th Cir. 2013); *United States v. Robertson*, 387 F.3d 702, 704-05 (8th Cir. 2004) ("The business of drug trafficking and the modus operandi of drug dealers are matters unfamiliar to jurors."); *United States v. Gill*, 513 F.3d 836, 847 (8th Cir. 2008). Admission of expert testimony or lay opinion testimony is a matter within the broad discretion of the trial judge that will not be disturbed absent an abuse of that discretion. *United States v. Anderson*, 446 F.3d 870, 874 (8th Cir. 2006); *United States v. Roach*, 644 F.3d 763, 763 (8th Cir. 2011) (advocating standard of "substantial deference").

The Eighth Circuit has repeatedly recognized that Rule 702 permits a district court to allow the testimony of a witness whose knowledge, skill, training, experience or education will assist a trier of fact in understanding the business of drug trafficking. *Robertson*, 387 F.3d at 704 (citing *United States v. Solorio-Tafolla*, 324 F.3d 964, 965 (8th Cir. 2003)) (expert allowed to testify about

11

"(1) the price of drugs in drug trafficking; (2) drug quantities obtained for personal use; (3) drug conspiracies and roles of drug traffickers; (4) how to manufacture methamphetamine; (5) drug investigation and wiretap operations; and (6) the lack of fingerprint evidence on packaging); *Gill*, 513 F.3d at 847 (agent's testimony assisted the jury in understanding "the business of drug trafficking")).

The federal courts as a whole have also routinely permitted law enforcement agents to give expert testimony in a variety of areas concerning drug trafficking. *United States v. Ham*, 628 F.3d 801, 804 (6th Cir. 2011); *United States v. Urbina*, 431 F.3d 305, 311 (8th Cir. 2005) (practice and knowledge of drug couriers during transport); *United States v. Jeanetta*, 533 F.3d 651, 657 (8th Cir. 2008) (surveillance techniques and use of "innocuous household items" in drug trafficking schemes); *United States v. Jiminez*, 487 F.3d 1140, 1145 (8th Cir. 2007) (pattern of one-way airline tickets not purchased in advance); *Gill*, 513 F.3d 836 at 847 (link between firearms and drug trafficking); *United States v. Spotted Elk*, 548 F.3d 641, 663 (8th Cir. 2008) (typical use of items involved in manufacture like saran wrap, tin foil and grease); *United States v. Beltran-Arce*, 415 F.3d 949, 951 (8th Cir. 2005) (typical drug record-keeping procedures); *Solorio-Tafolla*, 324 F.3d at 966 (methods of distribution and manufacture).

In this Circuit, it is well settled that narcotics agents may testify as to the nature, quantity, and street value of drugs, as they relate to the defendant's intent to distribute. *United States v. Kelly*, 679 F.2d 135 (8th Cir. 1982). In addition, agents have been permitted to testify as to the quantity of narcotics being indicative of distribution, *United States v. Robertson*, 387 F.3d 702, 704 (8th Cir. 2004), the typical usage amounts of the narcotic, *Solorio-Tafolla*, 324 F.3d at 965, the nexus between drug trafficking and firearms, *Gill*, 513 F.3d at 847, and the meaning of jargon and code words, *Beltran-Arce*, 415 F.3d at 951; *United States v. Delpit*, 94 F.3d 1134, 1145 (8th

12

Cir. 1996) ("There is no more reason to expect unassisted jurors to understand drug dealers' cryptic slang than antitrust theory or asbestosis.").

### B. PROFFER PROTECTED STATEMENTS

On January 6, 2020, the defendant provided proffer protected statements to the Government, including that: (1) he had prior felony drug convictions; (2) he started selling fentanyl approximately 1 to 2 years prior to August 2018 due to lack of work; (3) he dealt heroin to J.P. (a/k/a "Sulu") for several years before J.P.'s death; (4) J.P. referred to the defendant as "B"; (5) he does not remember selling heroin to J.P. on the day that J.P. died but that he was not saying that he did not sell to him that day; and (6) he received a shotgun from Ms. Melva Davis and used it for his protection. According to the terms of the attached proffer agreement, the Government cannot use these statements against the defendant except "…the Government may cross-examine [the defendant] concerning any statements made or other information provided during the interview and use the statements and information as substantive evidence to rebut any evidence offered or elicited or factual assertions made by or on behalf of [the defendant] at any stage of a criminal prosecution, including…trial." *See* Attachment A, at page 3.

If the defense makes any statements in the opening statement or cross-examines any Government witness with a question or assertion that suggests any fact that contradicts any of the above statements made by the defendant, the Government is entitled to elicit testimony regarding the defendant's prior statements. *See United States v. Barrow*, 400 F.3d 109, 121 (2d Cir. 2005) (finding that any factual assertions, including those made during opening argument or indirectly through cross-examination can trigger the waiver language in proffer agreement); *United States v. Hardwick*, 544 F.3d 565, 570–71 (3d Cir. 2008) (finding that the cross-examination of a Government witness can trigger the waiver language in proffer agreement); *United States v.*

13

*Shannon*, 803 F.3d 778, 786 (6th Cir. 2015) (same).  For example, any position, defense, statement or line of questioning suggesting that the defendant did not sell opiates would trigger the waiver and allow the Government to present testimony regarding the defendant's prior statements.  *See Barrow*, 400 F.3d at 121 (stating that "'rebuttal' is hardly limited to evidence that directly contradicts what it opposes; rather, rebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary.")

### C. BUSINESS RECORDS

The Government intends to introduce certain business records.  The Government has previously filed notices of its intent to use these items and anticipates filing another on this date.  Defense counsel has been provided with copies of the records that the Government possesses.

Rule 803(6) of the Federal Rules of Evidence provides that records of regularly conducted activity may be admitted by certification that complies with Rule 902(11).  Rule 902(11) requires that the party intending to offer the record must provide written notice and must make the record and declaration available for inspection.  The Government has complied with these and will continue to comply with these requirements and intends to introduce these records at trial.  The records are from Sprint Spectrum and relate to the defendant's cell phone ending in #8454.

### D. FORFEITURE

The Second Superseding Indictment contains a forfeiture allegation listing certain property seized by law enforcement during the course of the conspiracy.  If the jury finds the defendant guilty of the charges, the Government will seek forfeiture of all property derived from or used in connection with the drug felonies pursuant to the provisions of Title 21, United States Code, Section 853;  and any firearm or ammunition involved in or used in the felon in possession felony

pursuant to Title 21, United States Code, Section 924(d)(1) and Title 28, United States Code, Section 2461(c).

The forfeiture issues will not be considered until and unless the jury returns a guilty verdict on one or more of the counts giving rise to the forfeiture. *See* Rule 32.2(b)(1). In that event, the court must determine what property is subject to forfeiture and the amount of any money judgment that the defendant will be ordered to pay. Rule 32.2(b)(1)(A). The court's determination may be based on evidence already in the record and on any additional evidence or information submitted by the parties. Rule 32.2(b)(1)(B). The Rules of Evidence do not apply in the forfeiture phase of the trial. *See United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010) (because forfeiture is part of sentencing, less stringent evidentiary standards apply in the forfeiture phase of the trial; the evidence need only be "reliable"); *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007) (Rule 32.2(b)(1) allows the court to consider "evidence or information," making it clear that the court may consider hearsay; this is consistent with forfeiture being part of the sentencing process where hearsay is admissible).

The Government's burden is to establish the forfeitability of the property by a preponderance of the evidence. *See Libretti v. United States,* 516 U.S. 29, 36 (1995) (criminal forfeiture is part of the sentence and not a substantive element of the offense, so "preponderance of the evidence" standard applies).

Generally, the forfeiture determination is made by the court, not the jury. *See* Rule 32.2(b)(1)(A). The rule, however, gives the defendant a limited right to have the jury retained to determine the forfeitability of specific property. Rule 32.2(b)(5). If the jury is retained after it delivers its verdict on the charges, "[t]he only issue for the jury . . . would be whether the government has established the requisite nexus between the property and the offense" by a

15

preponderance of the evidence. Fed. R. Crim. P. 32.2, advisory cmte. note; *see also United States v. Gregoire,* 638 F.3d 962, 972 (8th Cir. 2011) (holding that jury's role in forfeiture phase of trial is limited to determining the "forfeitability of *specific property*" (emphasis added)).

To invoke this right, the defendant must make his election known to the Court prior to the time the jury begins its deliberation regarding his guilt or innocence. Rule 32.2(b)(5)(A). The purpose of that provision, which was added to Rule 32.2 in 2009, is to allow the Court and the jurors to plan their calendars, and to allow the Government time to prepare special verdict forms and jury instructions, or conversely, to save the Court and the Government the judicial resources that would be wasted making such preparations if the defendant intends to waive the jury. *See* Advisory Committee Note to 2009 Amendment to Subdivision (b)(5)(A).[1] If the defendant fails to make a timely request to have the jury retained, his right to do so is waived. *See United States v. Nichols*, 429 F. App'x. 355, 356 (4th Cir. 2011) (per curiam) ("although a defendant has a right to have a jury decide a forfeiture issue, the defendant must affirmatively assert that right," citing Rule 32.2(b)(5)); *see also United States v. Hively*, 437 F.3d 752, 763 (8th Cir. 2006) (holding, under former Rule 32.2(b)(4), that defendant waived his right to have the jury determine the forfeiture by not making a specific request to have the jury retained for that purpose).

The limited right to have the jury determine the forfeiture applies only to specific assets that the Government alleges to have been directly involved in, used in, or traceable to, the offenses giving rise to the forfeiture. There is no right to have the jury determine the amount of a money

---

[1] The Advisory Committee Note provides, in pertinent part, as follows:
Although the rule permits a party to make this request just before the jury retires, it is desirable, when possible, to make the request earlier, at the time when the jury is empaneled. This allows the court to plan, and also allows the court to tell potential jurors what to expect in terms of service.

judgment that the defendant will be ordered to pay. *See United States v. Tedder*, 403 F.3d 836, 841 (7th Cir. 2005) (the defendant's right under Rule 32.2(b) is to have the jury determine if the Government has established the required nexus between the property and his crime; the rule does not give the defendant the right to have the jury determine the amount of a money judgment); *see also United States v. Gregoire*, 638 F.3d 962, 972 (8th Cir. 2011) (following *Tedder*).

In this case, the Government is seeking the forfeiture of specific property – namely currency and firearms that were seized from the defendant's residence. The Government will be prepared to establish the forfeitability of the listed assets by a preponderance of the evidence. Additionally, the United States does not request that any forfeiture determination be made by the jury, but respectfully requests that the court inquire of the defendant, at the latest, prior to deliberations, whether the defendant will be invoking his limited right under Rule 32.2(b)(5) to have the jury retained.

Any other anticipated issues will be raised by the Government prior to trial.

Respectfully submitted,

SAYLER A. FLEMING
United States Attorney

 */s/ Kyle T. Bateman*
KYLE T. BATEMAN, #996646DC
Assistant United States Attorney
111 South 10th Street, Room 20.333
St. Louis, Missouri 63102

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2022, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record.

                                                    */s/ Kyle T. Bateman*
                                                    KYLE T. BATEMAN, #996646DC
                                                    Assistant United States Attorney